# EXHIBIT N

### SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is entered into as of January 2, 2012, by and among: (A) (i) Tower Park Properties, LLC, a Delaware limited liability company ("TPP"); (ii) Tower Park Development Company, LLC, a Delaware limited liability company ("TPDC"); (iii) Charles S. Dickens, individually ("CSD"); (iv) Doris Ragsdale Dickens ("DRD") and, together with CSD, "Dickens"); (v) LA Stars, LLC, a California limited liability company ("LA Stars"); (vi) Victorino Noval, individually ("VN") and as sole trustee of the Advisors Trust ("Advisors"); (vii) Victor Franco Noval, individually ("VFN") and as sole trustee of the Sherbourne Trust ("Sherbourne"); (viii) Tower Financial, LLC, a Delaware limited liability company ("Tower Financial"); and (ix) Secured Capital Partners, LLC, a California limited liability company ("SCP") (TPP, TPDC, Dickens, LA Stars, VN, VFN, Sherbourne, Tower Financial, Advisors and SCP, collectively, are referred to herein as the "TPP Parties"); and (B) (i) Hughes Investment Partnership, LLC, a Delaware limited liability company ("HIP"); (ii) MH Holdings II H, LLC, a Delaware limited liability company ("MH II"); (iii) Conrad Lee Klein, individually and as a trustee of the Mark Hughes Family Trust ("Klein"); and (iv) Jack Reynolds, individually and as trustee of the Mark Hughes Family Trust ("Reynolds") (HIP, MH II, Klein and Reynolds, collectively, are referred to herein as the "HIP Parties", and the HIP Parties and TPP Parties, collectively, are referred to herein as the "Parties"), with reference to the following facts:

Settlement Agreement

## RECITALS

A.      TPP is the reorganized debtor under that certain Fifth Amended Plan of Reorganization (the "Amended Plan") as confirmed by order entered April 1, 2010 by the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), in Case No. 2:08-bk-20298-BR (the "Bankruptcy Case"). The Effective Date of the Amended Plan occurred on April 16, 2010 (the "Effective Date").

B.      SCP is the assignee and holder of the claims and rights of La Jolla Capital Investors, LLC ("LJCI") against TPP and the Property and under the Amended Plan.

C.      Disputes have arisen between the TPP Parties, on the one hand, and the HIP Parties, on the other hand (the "Disputes").

D.      The Parties engaged in mediation on November 19 and 20, 2012, before Judge Mitchel R. Goldberg (Ret.) in an effort to resolve the Disputes. The Parties desire to settle their Disputes by entering into this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

1.      Definitions. As used herein, the following terms shall have the meanings given them below:

(a)      "First Loan" means that certain pre-petition loan from HIP to TPDC in the original principal amount of $1,600,000.00.

- 2 -

LA1 260432 1v.16

(b)    "MH II Loan" means that certain pre-petition loan from MH II to TPP in the original principal amount of $29,700,000.00.

(c)    "Third Loan" means that certain pre-petition loan from HIP to TPP in the original principal amount of $12,000,000.00.

(d)    "Exit Financing Facility" means that certain construction loan from HIP to TPP in the original principal amount of up to $7,000,000.00 evidenced by, *inter alia*, that certain Construction Loan Agreement dated June 10, 2010.

(e)    "Loans" means the First Loan, the MH II Loan, the Third Loan and the Exit Financing Facility, collectively.

(f)    "Loan Documents" means all documents evidencing and securing the Loans including but not limited to all promissory notes, loan agreements and deeds of trust executed by any of the TPP Parties in favor of HIP or MH II.

All other capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings given to them in the Amended Plan.

2.    Settlement Payment.  Upon execution hereof by the Parties and as a condition precedent to the obligations of the HIP Parties under this Agreement, the TPP Parties shall pay to HIP, by certified check issued by a national bank satisfactory to HIP or by wire transfer of immediately available federal funds to an account designated in writing by HIP, the sum of $5,000,000.00 (the "Settlement Payment").  The Settlement Payment shall not be (i) refundable to TPP Parties for any reason whatsoever, (ii) applicable to amounts owed to any of the HIP Parties under the Loans or otherwise, (iii) applicable to the Discounted Payoff Amount (defined

- 3 -

Settlement Agreement

LA1 2604321v 16

EXHIBIT J
170

Exhibit N
290

below), (iv) applicable to the Initial Extension Payment or any Quarterly Extension Fees (each as defined below), or (v) applicable to any other amounts that are or may subsequently become due or payable by any of the TPP Parties under this Agreement, the Loans or the Amended Plan.

3.      TPP Dismissals.  Upon the execution hereof by the Parties, the TPP Parties shall file stipulated dismissals with prejudice and/or withdrawals with prejudice and proposed orders thereon (the "TPP Dismissals") of all actions, adversary proceedings, contested matters or motions (collectively, "Actions") filed, brought or asserted by any of the TPP Parties against any of the HIP Parties or Christopher Pair, individually or as trustee of the Mark Hughes Family Trust ("Pair") in the Bankruptcy Court or elsewhere which (i) are pending or (ii) have been dismissed or withdrawn without prejudice prior to the date hereof, including but not limited to all such matters listed on Exhibit A hereto. The TPP Dismissals shall be in form and substance satisfactory to counsel for HIP.

4.      TPP Release.  Effective as of the date hereof:

(a)      The TPP Parties, and each of them, on their own behalf and on behalf of each of their respective past, present and future parents, pledgees, affiliates, subsidiaries, predecessors, successors, officers, directors, partners, managers, members, trustees, beneficiaries, servants, employees, shareholders, agents, assigns, heirs, representatives, accountants and attorneys, and with respect to each of them, their respective past, present and future parents, pledgees, affiliates, subsidiaries, predecessors, successors, officers, directors, partners, managers, members, trustees, beneficiaries, servants, employees, shareholders, agents, assigns, heirs, representatives, accountants and attorneys (collectively, the "Releasors"), hereby fully and forever release, relinquish,

- 4 -

LA1 260432 1v.16

Settlement Agreement

discharge and acquit the HIP Parties, Pair, and each of them, and each of their past, present and future parents, affiliates, subsidiaries, predecessors, successors, officers, directors, partners, managers, members, trustees, beneficiaries, servants, employees, shareholders, agents, assigns, heirs, representatives, accountants and attorneys, and with respect to each of them, their respective past, present and future parents, affiliates, subsidiaries, predecessors, successors, officers, directors, partners, managers, members, trustees, beneficiaries, servants, employees, shareholders, agents, assigns, heirs, representatives, accountants and attorneys (collectively, the "Released Persons"), of and from and against any and all claims, counterclaims, defenses, demands, obligations, duties, liabilities, damages, expenses, claims of offset, indebtedness, debts, breaches of contract, duty or relationship, acts, omissions, misfeasance, malfeasance, causes of action, sums of money, accounts, compensation, contracts, controversies, promises, damages, costs, losses and remedies therefor, choses in action, rights of indemnity or liability of any type, kind, nature, description or character whatsoever,  whenever and however arising or accruing, whether known or unknown, suspected or unsuspected, which could, might or may be claimed to exist, whether liquidated or unliquidated (the "Released Claims"); provided, however, that the foregoing release shall not apply to any obligations, covenants or agreements of any of the Released Persons which are to be performed from and after the date hereof.

(b)    The Releasors hereby waive the provisions of any applicable laws restricting the release of claims which the Releasors do not know or suspect to exist at the time of release, which, if known, would have materially affected the decision to agree to these releases.  In this connection, the Releasors hereby agree, represent and warrant to

- 5 -

LA1 260432 1v.16

Settlement Agreement

one another and to the Released Persons that the Releasors realize and acknowledge that factual matters now unknown may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and the Releasors further agree, represent and warrant that the releases provided herein have been negotiated and agreed upon in light of that realization and that the Releasors nevertheless hereby intend to release, discharge and acquit the Released Persons from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are in any manner related to the Released Claims and all dealings in connection therewith.

(c)    The Releasors hereby acknowledge that they have not relied upon any representation of any kind made by any of the HIP Parties or Pair in making the foregoing release.

(d)    Each of the Releasors represents and warrants that it is the sole owner and that it has made no sale, assignment, transfer, conveyance, subrogation or other disposition of any of the Released Claims released by such Releasor in this Agreement, to any person or entity not a party to this Agreement. Each of the Releasors agrees to defend, indemnify, and hold harmless each of the Released Persons from and against any claim, demand, damage, debt, liability, account, obligation, cost, expense, lien, injunctive relief, fee, or action or cause of action (including, without limitation, attorneys' fees and costs actually incurred) based upon, in connection with, or arising out of any assignment or transfer or purported assignment or transfer by any of the Releasors of any of the Released Claims.

- 6 -

Settlement Agreement

LA1 2604321v.16

(e)    WITHOUT LIMITING ANY OF THE PROVISIONS OF THIS
SECTION 4, THE RELEASORS HEREBY AGREE, REPRESENT AND WARRANT
THAT THE MATTERS RELEASED HEREIN ARE NOT LIMITED TO MATTERS
WHICH ARE KNOWN OR DISCLOSED, AND THE RELEASORS HEREBY WAIVE
ANY AND ALL RIGHTS AND BENEFITS WHICH THEY NOW HAVE, OR IN THE
FUTURE MAY HAVE CONFERRED UPON THEM, BY VIRTUE OF THE
PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR
REGULATIONS, INCLUDING BUT NOT LIMITED TO, SECTION 1542 OF THE
CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH PROVIDES AS
FOLLOWS:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(f)    Each of the Releasors acknowledges and agrees that it has no
defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims,
demands, damages, facts, or law of any kind or nature whatsoever against any of the
Released Persons. Each of the Releasors acknowledges and agrees that it or its attorneys
may, after execution of this Agreement, discover claims, damages, facts or law different
from or in addition to those which each now knows or believes to exist or be applicable
with respect to this Agreement. Nonetheless, it is the Parties' intention fully, finally and
forever to settle and release each and every matter released in this Agreement, known and

- 7 -

Settlement Agreement

LA1 2604321v.16

unknown, suspected or unsuspected, which now exist, may exist, or heretofore have existed, which is released in this Agreement. In furtherance of this intention, the releases given by the Releasors in this Agreement shall be and remain in effect as full and complete releases of all released matters notwithstanding the discovery or existence of any such additional or different defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims, demands, damages, facts or law.

(g)    Each of the Releasors covenants not to (i) institute, bring, pursue or continue any action or proceeding based upon any Released Claims before any court, arbitrator or other tribunal in any jurisdiction, whether as a claim, a cross-claim, or counterclaim, (ii) assert any defense, counterclaim, offset, cross-complaint, cause of action, right, claim or demand of any kind or nature based upon any Released Claims in any action or proceeding, or (iii) provide any assistance or cooperation to any person or entity seeking to assert or enforce any Released Claims.

5.    Tolling Agreement; Waiver of Defenses and Claims.

(a)    The TPP Parties agree that the running of any period of limitations, period of repose, or other rule, provision, or principle, whether imposed by contract, statute, or otherwise, limiting the period in which any claims any of the HIP Parties or Pair may presently have against any of the TPP Parties, including but not limited to any claims any of the HIP Parties or Pair may presently have in connection with the Disputes and/or any claims which are the subject of the Actions dismissed pursuant to the HIP Dismissals (the "Tolled Claims"), may or must be brought shall be tolled as of the date that the first Action filed by HIP was filed, and the running thereof shall not resume until

- 8 -

LA1 2604321v.16

the payment of either the Discounted Payoff Amount or the Initial Extension Payment on or before September 30, 2013 (such period, the "Tolling Period").

(b)    Without limiting the generality of Section 4 hereof, each of the TPP Parties waives and agrees not to assert, plead, or raise against any of the HIP Parties or Pair in any fashion or manner (whether by answer, complaint, third party complaint, motion or otherwise) any defense, counterclaim, offset, cross-complaint, cause of action, right, claim or demand of any kind or nature with respect to a Tolled Claim, including but not limited to any such defense, counterclaim, offset, cross-complaint, cause of action, right, claim or demand based on doctrines of laches, waiver, estoppel, or similar doctrines or statutory limitations concerning the timeliness of a Tolled Claim.  The TPP Parties acknowledge and agree that all such defenses, counterclaims, offsets, cross-complaints, causes of action, rights, claims and demands are Released Claims and have been fully and irrevocably released pursuant to this Agreement.

(c)    This Agreement does not constitute an admission or acknowledgment by any HIP Party that any statute of limitation or other defense concerning the timeliness of a claim is applicable, that any statutory, contractual, or other period of limitation or repose would otherwise have run during the effective period of the tolling provisions of this Agreement, or that the doctrine of equitable tolling or any other doctrine does not independently apply to toll any statute of limitation or other defense concerning the timeliness of a claim.

- 9 -

Settlement Agreement

LA1 2604321v.16

6.    Bankruptcy Court Approval of Certain Provisions.

(a)    The Parties agree to use their reasonable best efforts to obtain the approval of the Bankruptcy Court of the provisions of Section 7 hereof, entitled "HIP Dismissals and Restoration of Status Quo," and Section 8 hereof, entitled "Plan Modifications" (collectively, the "Conditional Provisions"). The TPP Parties shall file the motion for such approval (the "Approval Motion"), in form and substance satisfactory to counsel to the HIP Parties, within five (5) days after (i) the full execution of this Agreement and (ii) the delivery of the Settlement Payment to HIP, but in any event in time sufficient to obtain a hearing in the Bankruptcy Court to approve the Conditional Provisions ("Bankruptcy Court Hearing") such that the Bankruptcy Court Approval (as defined below) shall occur no later than February 15, 2013. The Bankruptcy Court's approval of the Conditional Provisions shall be final upon the expiration of the fourteen (14) day appeal period following entry of the Bankruptcy Court's order without the filing of any appeal (such final approval is referred to herein as the "Bankruptcy Court Approval").

(b)    The Parties agree that:    (i) this Agreement, other than the Conditional Provisions, shall be effective and operative upon execution hereof by the Parties; (ii) the Conditional Provisions shall be effective upon Bankruptcy Court Approval; (iii) if Bankruptcy Court Approval is not obtained by February 15, 2013, the Conditional Provisions shall be void and of no force or effect *ab initio*; and (iv) all provisions of this Agreement other than the Conditional Provisions shall be binding, enforceable, irreversible and non-rescindable regardless of whether  or not the Bankruptcy Court Approval is ever obtained.   The HIP Parties agree to cooperate with

- 10 -

Settlement Agreement

LA1 2604321v.16

and support the TPP Parties' efforts to seek Bankruptcy Court approval of the Conditional Provisions.

7.     HIP Dismissals; Restoration of Status Quo Ante on Maturity Default.

(a)     Upon the occurrence of Bankruptcy Court Approval, the HIP Parties shall file stipulated dismissals without prejudice (the "HIP Dismissals") of all pending Actions filed, brought or asserted by any of the HIP Parties against any of the TPP Parties in the Bankruptcy Court, including but not limited to the matters listed on Exhibit B hereto.  The HIP Dismissals shall be subject in all respects to the provisions of Sections 4, 5 and 7(b) hereof.

(b)     Notwithstanding anything to the contrary herein, if (i) Bankruptcy Court Approval has occurred, (ii) the TPP Parties have not paid either the Discounted Payoff Amount (as defined below) or the Initial Extension Payment (as defined below) on or before September 30, 2013 (the "Initial DPO Cutoff Date") and (iii) the TPP Parties fail to pay all outstanding principal, interest, fees, expenses and other amounts due and owing under the Loans calculated without reference to any Discounted Payoff Amount ("Outstanding Loan Balance") on or before June 10, 2014 (the "Existing Maturity Date") (such failure, a "Maturity Default"), then in addition to any rights and remedies of the HIP Parties under the Amended Plan or the Amended Loan Documents in respect of the Maturity Default, (A) all rights and claims of the HIP Parties against the TPP Parties (including but not limited to the rights of the HIP Parties under the Loan Documents as in effect prior to this Agreement and the claims of the HIP Parties against the TPP Parties existing as of such time and all claims set forth in any of the Actions dismissed without

- 11 -

LA1 260402v.16

Settlement Agreement

EXHIBIT J
178

Exhibit N
298

prejudice pursuant to the HIP Dismissals) shall be restored and revived to their status as of immediately before the Parties entered into this Agreement, (B) the HIP Parties shall have the right to assert and bring any such claims against the TPP Parties, and the HIP Parties shall have the right to file or re-file and prosecute any and all Actions against the TPP Parties as the HIP Parties may elect to file, re-file or prosecute in their sole and absolute discretion; (C) the HIP Parties shall have the right to (i) use any and all discovery obtained in connection with the Disputes or the Actions dismissed by the HIP Dismissals, (ii) enforce all current discovery orders entered by the Bankruptcy Court, including the discovery sanctions set forth in the Court's Order dated November 15, 2012, and (iii) re-file its pending motion for attorneys' fees in connection with the LA Stars Lawsuit (as defined on Exhibit B hereto); (D) unless and until all of the TPP Parties have completed their obligations pursuant to this Agreement, all TPP Parties shall continue to preserve any documents in their possession, custody or control relating to any of the pending Actions and/or the Property; and (E) by reason of the provisions of Sections 4 and 5 hereof, the TPP Parties shall be estopped and forever barred from raising or asserting any defense whatsoever to any such claims or Actions. All rights and remedies of the HIP Parties against the TPP Parties shall be exercisable without the necessity of any relief from the automatic stay.

8.    Plan Modifications. Subject to Bankruptcy Court Approval, the Amended Plan is hereby modified as follows (the "Plan Modifications"):

(a)    Amendments to Loans. The Parties agree to modify the Loans as follows:

- 12 -

LA1 260432 1v.16

Settlement Agreement

(i)       Discounted Payoff.  HIP on behalf of itself and MH II will accept a discounted payoff of the Loans on the following terms and conditions:

(A)    HIP will accept a discounted payoff amount ("Discounted Payoff Amount") of $57,500,000.00 in full satisfaction of the TPP Parties' obligations under the Loans if such amount is paid on or before the Initial DPO Cutoff Date.

(B)    If the TPP Parties do not pay the Discounted Payoff Amount of $57,500,000.00 to HIP on or before the Initial DPO Cutoff Date, then the right of the TPP Parties to pay a Discounted Payoff Amount will terminate on the Initial DPO Cutoff Date unless the TPP Parties pay to HIP the sum of $10,000,000.00 (the "Initial Extension Payment") on or before the Initial DPO Cutoff Date.  The Initial Extension Payment shall reduce the Discounted Payoff Amount by $10,000,000.00 and shall be applied to the Loans in the following order of priority: (1) First, to the Third Loan; (2) second, to the MH II Loan; (3) third, to the First Loan; and (4) fourth, to the Exit Financing Facility.

(C)    If the TPP Parties pay the Initial Extension Payment on or before the Initial DPO Cutoff Date, then:

(1) The TPP Parties shall have the right to pay the Discounted Payoff Amount, and the HIP Parties agree to accept the Discounted Payoff Amount, as reduced by the payment of the Initial Extension Payment and increased pursuant to the following subsection (C)(2), at any time through and including March 31, 2014 (the "First Extended DPO Cutoff Date"); and

- 13 -

LA1 2604321v.16

(2) the Discounted Payoff Amount (as reduced by the Initial Extension Payment to $47,500,000) shall increase by $833,333.00 per calendar month on the first day of each month commencing as of July 1, 2013.

(D)    The TPP Parties may further extend the date by which Discounted Payoff Amount will be accepted in full satisfaction of the Loans and the Maturity Date of the Loans (such date, the "DPO Cutoff Date") from the First Extended DPO Cutoff Date on a rolling quarterly basis up to but not beyond December 16, 2017 (the "Outside Maturity Date") by paying HIP an extension fee (each, a "Quarterly Extension Fee") of $500,000.00 by wire transfer of immediately available funds to such account(s) as HIP shall designate, no later than the last business day of the end of each calendar quarter commencing on March 31, 2014. Each payment of a Quarterly Extension Fee shall extend the DPO Cutoff Date to the last day of the month of the next calendar quarter but in no event beyond the Outside Maturity Date. Each date from and after September 30, 2013 to which such DPO Cutoff Date is extended under this Agreement shall be the "Maturity Date" for all purposes under the Loans and this Agreement. Quarterly Extension Fees are consideration for extending the DPO Cutoff Date and the term of the Loans and shall not be applicable to reduce the Discounted Payoff Amount or to any principal, interest or any other amounts accrued, due or to become due under the Loans.

(E)    The HIP Parties shall have no obligation to accept the Discounted Payoff Amount, the TPP Parties shall have no right to satisfy the Loans by paying

- 14 -

Settlement Agreement

LAI 2604321v.16

EXHIBIT J
181

Exhibit N
301

the Discounted Payoff Amount, and the Outstanding Loan Balance shall be due and payable in full, in accordance with the following:

(1) The then-Outstanding Loan Balance shall be due and payable in full on the Existing Maturity Date if the TPP Parties do not pay either the Discounted Payoff Amount or the Initial Extension Payment on or before the Initial DPO Cutoff Date.

(2) The then-Outstanding Loan Balance shall be due and payable in full if the TPP Parties have paid the Initial Extension Payment on or before the Initial DPO Cutoff Date but fail to pay the Discounted Payoff Amount on or before the Initial DPO Cutoff Date or any subsequent date to which the DPO Cutoff Date has been extended in accordance with this Agreement.

(3) The then-Outstanding Loan Balance shall be due and payable in full on the date on which the Loans are accelerated as a result of a default or event of default thereunder occurring after the date of this Agreement (subject to any applicable cure periods under the Amended Loan Documents).

(F)    The Parties acknowledge and agree that the Discounted Payoff Amount is less than the outstanding balances of the Loans, which outstanding balances, in the aggregate (exclusive of default interest, fees and costs), are $81,601,265.88 as of December 31, 2012. No Exit Fee shall be due or payable upon payment of the Discounted Payoff Amount pursuant to this Agreement.

- 15 -

Settlement Agreement

EXHIBIT J
182

(ii)    Payments by Wire Transfer.  All payments to be made by the TPP Parties pursuant to this Section 8 shall be made by wire transfer of immediately available funds to such account(s) as HIP shall designate, and must be received in such account(s) on the date specified for payment in order to be deemed paid on such date.

(iii)    Mutual Release.  Upon the (A) payment of the Discounted Payoff Amount or the Initial Extension Payment to HIP on or before the Initial DPO Cutoff Date, (B) payment of the Discounted Payoff Amount on or before any DPO Cutoff Date subsequent to the Initial DPO Cutoff Date or (C) payment of the Outstanding Loan Balance in full on the Existing Maturity Date, the TPP Parties and the HIP Parties shall execute and deliver the Mutual Release in the form attached hereto as Exhibit C.

(iv)    Development of the Property.  Prior to the payment of the Initial Extension Payment or the Discounted Payoff Amount on or before the Initial DPO Cutoff Date, the TPP Parties may continue development of the Property in accordance with the Amended Loan Documents but shall not commence any vertical construction on the Property.  After payment of the Initial Extension Payment on or before the Initial DPO Cutoff Date, the TPP Parties may undertake vertical construction on the Property provided that (i) any residential improvements constructed by a TPP Party on a Lot on the Property shall have at least 15,000 habitable square feet; (ii) the Property shall not become subject to any liens, including but not limited to mechanics liens; (iii) such improvements shall comply with all applicable laws, rules, codes and regulations of all

- 16 -

Settlement Agreement

LA1 2601321v.15

applicable governmental authorities; and (iv) once such construction is commenced, it is pursued diligently to completion.

(v)    Alternative Condition to Extending DPO Cutoff Date. Notwithstanding Section 8(a)(i)(D) above, provided that the Initial Extension Payment has been paid on or before the Initial DPO Cutoff Date, each time from and after December 31, 2014 that TPP obtains from the City of Los Angeles a valid, final certificate of occupancy for a residential dwelling constructed by TPP or TPDC on the Property (a "Certificate of Occupancy") and provides evidence to HIP of the issuance of such Certificate of Occupancy, the DPO Cutoff Date shall be extended until the earlier of (A) one (1) year from the end of the calendar quarter in which the Certificate of Occupancy is issued or (B) the Outside Maturity Date, in either event without payment of any Quarterly Extension Fees.

(vi)    Hughes Release Prices. Upon the bona fide all-cash sale of Lots to third parties (and so long as TPP or TPDC is not then in default under any of the Loans), MH II and HIP shall partially reconvey the liens of the Existing Loans and Deeds of Trust from the Lots then sold, upon payment to HIP of the following amounts (the "Hughes Release Prices"):

(A)    For any of Lots 1, 2, 4 and/or 5 which are not improved with residential improvements at the time of sale, an amount equal to twenty percent (20%) of the then aggregate outstanding total balance of the Loans for the first such Lot so released.

- 17 -

LA1 260432 1v 16

Settlement Agreement

EXHIBIT J
184

Exhibit N
304

(B)    For any of Lots 3 and/or 6 which are not improved with residential improvements at the time of sale, an amount equal to twenty-five percent (25%) of the then-aggregate outstanding total balance of the Loans for the first such Lot so released.

(C)    For any of Lots 1, 2, 4 and/or 5 which are improved with residential improvements at the time of sale, an amount equal to twenty-five percent (25%) of the then aggregate outstanding total balance of the Loans for the first such Lot so released.

(D)    For any of Lots 3 and/or 6 which are improved with residential improvements at the time of sale, an amount equal to thirty percent (30%) of the then-aggregate outstanding total balance of the Loans for the first such Lot so released. Each of the percentages in subsections (A), (B), (C) and this subsection (D) is referred to herein as a "Hughes Release Percentage."

(E)    For the last five (5) Lots, the applicable Hughes Release Percentage will be increased by multiplying such Hughes Release Percentage by a fraction, the numerator of which is six (6) and the denominator of which is the remaining number of then unsold Lots.

(vii)    Application of Hughes Release Prices. HIP shall apply the Hughes Release Prices paid to it in the following order of priority (notwithstanding the relative priority of the deeds of trust securing the Loans):

(A)    First, to repay the Third Loan;

- 18 -

Settlement Agreement

(B)    Second, to repay the MH II Loan;

(C)    Third, to repay the First Loan; and

(D)    Fourth, to repay the Exit Financing Facility.

(viii)    Application of Lot Sales Proceeds.  All proceeds of sale of any Lot, net of broker's commissions and other non-recurring closing costs approved by HIP, and after payment of the Hughes Release Prices ("Net Sale Proceeds"), shall be paid as follows:

(A)    Net Sales Proceeds from sales of Lots that are not improved with residential improvements at the time of sale shall be paid first, to or for the benefit of the other creditors of TPP in accordance with the provisions of the Amended Plan as in effect prior to the Bankruptcy Court Approval and in accordance with that certain Settlement Agreement dated as of June 10, 2010, by and among TPP, LJCI and Dickens (the "LJCI Settlement Agreement") (payments so made, the "Creditor Payments"), and then to TPP.

(B)    Net Sales Proceeds from sale of any Lot improved with residential improvements at the time of sale shall be paid (i) first, to the Creditor Payments, (ii) second, *pro rata* seventy percent (70%) to TPP and thirty percent (30%) to HIP until TPP has received an amount equal to the actual third-party costs and expenses incurred by TPP for design, permitting and construction of such residential improvements on such Lot, and (iii) third, *pro rata* seventy percent (70%) to HIP and thirty percent (30%) to TPP.  HIP shall apply its share of such

- 19 -

LA1 260432tv.16

proceeds ("Residual Proceeds") so received as provided in Section 8(a)(vii) above. The Bankruptcy Court Approval shall be deemed to have granted and created in favor of HIP a perfected first priority security interest in all Residual Proceeds to secure HIP's rights to the above-described shares thereof.

        (C)    Any Hughes Release Prices or Residual Proceeds received by HIP on or before the Initial DPO Cutoff Date shall be applicable to the Initial Extension Payment.

        (D)    Additionally, if after the Initial DPO Cutoff Date the TPP Parties are entitled to pay the Discounted Payoff Amount at the time the Hughes Release Prices or any Residual Proceeds are paid to HIP, the Hughes Release Prices or Residual Proceeds so paid to HIP shall reduce the Discounted Payoff Amount then payable.

        (b)    SCP as assignee of the claims and rights of LJCI against TPP and the Property approves this Agreement and all provisions hereof for all purposes of the LJCI Settlement Agreement.

        (c)    The Parties agree that notwithstanding that the Exit Financing Facility originally provided for disbursements of loan proceeds up to $7,000,000.00, the maximum amount of disbursements of loan proceeds under the Exit Financing Facility is capped at $5,600,000.00. The TPP Parties acknowledge and agree that the amount of $5,600,000.00 has been disbursed by HIP under the Exit Financing Facility and that HIP has no obligation to make any further disbursements or advances under the Exit Financing Facility. The TPP Parties further agree that none of the HIP Parties has any

- 20 -

Settlement Agreement

LA1 260432lv.16

obligation to extend any further credit or make any new loans or advances to any of the TPP Parties.

(d)  Upon the effective date of the Plan Modifications, the Improvement Funds Account (as defined in the Construction Loan Agreement evidencing the Exit Financing Facility) shall be closed and all funds held therein shall be disbursed to HIP for application to the Loans in HIP's sole discretion.

(e)  Each of the TPP Parties shall be fully, jointly and severally liable, on demand, for the full amount of the Loans, including but not limited to the outstanding principal balance, all accrued and unpaid interest and all costs, fees and other expenses including but not limited to attorneys' fees and disbursements, to which HIP and/or MH II may be entitled under the Amended Loan Documents, upon the occurrence of any of the following events (each, a "Triggering Event"):

(i)  TPP or TPDC or any member, shareholder or principal thereof directly or indirectly files a voluntary petition under Title 11 of the United States Code ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law (it being agreed and understood that the existence of the pending voluntary bankruptcy of David Rudich, a principal of TPP, case number 2:12-bk-13698-ER in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, shall not be deemed a Triggering Event); or

(ii)  Any TPP Party directly or indirectly files, or joins in the filing of, an involuntary petition against TPP or TPDC under the Bankruptcy

- 21 -

Settlement Agreement

EXHIBIT J
188

Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, or colludes with, solicits or causes to be solicited, petitioning creditors for any general partner, manager or managing member of TPP or TPDC; or

(iii)    Any TPP Party directly or indirectly files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against TPP or TPDC under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, or colludes with, solicits or causes to be solicited, petitioning creditors for any involuntary petition against any other TPP Party.

For purposes of this subsection (e), each TPP Party waives: (A) any defense based upon any lack of authority of the officers, directors, partners, managers, members or agents acting or purporting to act on behalf of any TPP Party, or any defect in the formation of any TPP Party or any principal of any TPP Party; (B) any defense based upon the application by any TPP Party of the proceeds of any of the Loans for purposes other than the purposes represented by any TPP Party to any HIP Party or intended or understood by the HIP Parties or the other TPP Parties; (C) any and all rights and defenses arising out of an election of remedies by HIP Parties, even though that election of remedies has destroyed such TPP Party's rights of subrogation and reimbursement against the principal; (D) any defense based upon failure by any HIP Party to disclose to such TPP Party any information concerning the financial condition of the other TPP Parties or any other circumstances bearing on the TPP Parties' ability to pay and

- 22 -

LA\ 2604321v.16

Settlement Agreement

perform their obligations under the Loans or this Agreement; (E) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal; (F) any defense based upon election by the HIP Parties, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any successor statute; (G) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code; (H) any right of subrogation, any right to enforce any remedy which any of the HIP Parties may have against any of the TPP Parties and any right to participate in, or benefit from, any security for the Loans now or hereafter held by any of the HIP Parties; (I) presentment, demand, protest and notice of any kind; and (J) the benefit of any statute of limitations affecting the liability of such TPP Party hereunder or the enforcement hereof.  Without limiting the generality of the foregoing or any other provision hereof, each TPP Party further expressly waives, to the extent permitted by law, any and all rights and defenses, including but not limited to any rights of subrogation, reimbursement, indemnification and contribution, which might otherwise be available to such TPP Party under applicable law.  Finally, each TPP Party agrees that the payment or performance of any act which tolls any statute of limitations applicable to the Loans shall similarly operate to toll the statute of limitations applicable to such TPP Party's liability hereunder.  The inclusion of this provision should not be construed as limiting and does not limit the scope of any other releases or tolling agreements set forth in this Agreement.

- 23 -

Settlement Agreement

EXHIBIT J
190

(f)    Release of Extra Parcels.  After Bankruptcy Court Approval has

occurred, and provided that (A) TPP has paid the Initial Extension Payment on or before

the Initial DPO Cutoff Date and (B) no default or event of default then exists under any

of the Loan Documents, the HIP Parties agree to release their liens on the Extra Parcels

(as defined below) without the payment of any release price, upon the satisfaction of each

of the following terms and conditions:

(i)    The Extra Parcels shall be conveyed to one or more third

party non-profit entities unaffiliated with any of the TPP Parties ("Conservancy

Transferee") in a bona fide, arms' length transaction.

(ii)    The Conservancy Transferee shall accept the Extra Parcels

in writing and agree to undertake at its sole cost and expense the maintenance of

such Extra Parcels in compliance with all applicable governmental conditions of

approval affecting or imposed upon the Property or its entitlements.

(iii)    TPP shall be solely responsible for the payment or

establishment of any funds or endowments for the maintenance of the Extra

Parcels to the extent such funds are required by the Conservancy Transferee as a

condition to its acceptance of the Extra Parcels.

(iv)    The TPP Parties shall indemnify, defend and hold harmless

the HIP Parties from and against any and all claims arising from or in any way

related to such transfer or the use and maintenance of the Extra Parcels so

transferred, pursuant to an indemnification agreement delivered at the time of

- 24 -

Settlement Agreement

LA1 2604321v.16

EXHIBIT J
191

Exhibit N
311

conveyance in form and substance satisfactory to HIP in its sole and absolute discretion.

(v)    The Extra Parcels shall be subject to covenants, conditions and restrictions satisfactory to (A) the City of Los Angeles and all other governmental and quasi-governmental authorities with jurisdiction over the Property and (B) HIP, restricting the use of such Extra Parcels to landscape, hardscape and fuel modification zones in accordance with the conditions of approval and other governmental requirements for the Property, and prohibiting further development on such parcels.

(vi)    The remaining Property shall not be encumbered, nor its development impeded or impaired, in any manner as a result of or in connection with such conveyance.  Neither the remaining Property nor any owner or developer thereof or beneficiary of any deed of trust thereon shall in any way be subject to any liens, liabilities or obligations to the Conservancy Transferee.

(vii)    The transfer of the Extra Parcels shall have been approved in writing by the highest applicable authority of the City of Los Angeles and all other governmental and quasi-governmental authorities with jurisdiction over the Property.

(viii)    The transfer of the Extra Parcels shall comply with the terms of a final grading permit for the Property.

- 25 -

LA1 2604321v.16

EXHIBIT J
192

(ix)    All other terms of the transfer of the Extra Parcels shall be subject to the prior approval of HIP, which approval shall not be unreasonably withheld or delayed.

(g)    To fully effectuate the Plan Modifications, the TPP Parties and the HIP Parties shall, on or before the date seven (7) days before the Bankruptcy Court Hearing, execute and deliver to each other the following documents (the "Amended Loan Documents"), each of which shall become effective as of the date hereof upon Bankruptcy Court Approval:

(i)    Amended and Restated Loan Agreement (Exit Loan) in the form attached hereto as Exhibit D;

(ii)    Amended and Restated Promissory Note (Exit Loan) in the form attached hereto as Exhibit E;

(iii)    First Amendment to Construction Deed of Trust in the form attached hereto as Exhibit F; and

(iv)    Second Omnibus Loan Modification Agreement in the form attached hereto as Exhibit G.

(h)    It shall be a condition precedent to the effectiveness of the Plan Modifications the order of the Bankruptcy Court approving the Plan Modifications shall have specifically found that the Loans as modified hereby are not usurious.

- 26 -

LA1 2604321v.16

Settlement Agreement

(i)    The parties acknowledge and agree that the Loans as modified hereby were arranged and negotiated through a real estate broker licensed under the laws of the State of California. The parties acknowledge that such real estate broker is Conrad Lee Klein, who is the manager of HIP and MH II, and who shall be paid a brokerage fee of $1,000.00 by the HIP Parties upon Bankruptcy Court Approval.

(j)    It shall be a condition precedent to the effectiveness of the Plan Modifications that HIP and MH II shall have received such title insurance policy endorsements as they may reasonably require insuring the continued priority of the Deeds of Trust securing the Loans, as amended by the Amended Loan Documents. The cost of all such endorsements and all recording fees payable in connection with recording any Amended Loan Documents shall be paid by TPP. Within two (2) business days after the execution hereof, HIP and TPP shall open an escrow with a title company satisfactory to HIP, and TPP shall deposit into such escrow the amount estimated by such title company to pay such recording fees, escrow fees and title premiums. Upon Bankruptcy Court Approval, the title company shall record the recordable Amended Loan Documents in the official records of Los Angeles County, California.

(k)    Except as modified by these Plan Modifications and the Amended Loan Documents, the Amended Plan and the Loan Documents shall continue in full force and effect, with such liens and security interests having and maintaining the priorities set forth in the Amended Plan. In the event the Plan Modifications and/or the Amended Loan Documents conflict with any provisions of the Amended Plan or the Loan Documents, the Plan Modifications and Amended Loan Documents shall be controlling

- 27 -

Settlement Agreement

and shall supersede the conflicting provisions in the Amended Plan and/or the Loan Documents.

9.      Representations and Warranties of the HIP Parties.  To induce the TPP Parties to enter into this Agreement, the HIP Parties hereby jointly and severally represent and warrant to the TPP Parties as follows:

(a)      Each of the HIP Parties has read and fully understands each of the provisions of this Agreement.

(b)      Each of the HIP Parties has relied on the advice and representation of legal counsel of its own choice with respect to the matters set forth in this Agreement.

(c)      Each HIP Party that is a legal entity: (i) is duly organized, existing and in good standing under the laws of the state in which it was formed or organized; (ii) is in good standing under the laws of the State of California; and (iii) has taken all necessary corporate, limited liability company, trust, general partnership and/or limited partnership actions, as applicable, to duly approve and authorize such HIP Party to enter into and perform this Agreement and no further such approval is necessary.

(d)      Each HIP Party that is a natural person has full legal capacity to enter into and perform this Agreement.  Each HIP Party that is a natural person executing this Agreement on behalf of a HIP Party that is an entity has full power, right and authority to execute this Agreement on behalf of such entity and so bind such entity.

- 28 -

LA1 2604321v.16

Settlement Agreement

(e)      Entering into and performing this Agreement will not violate any provision of law or the any limited partnership agreement, general partnership agreement, limited liability company agreement, operating agreement, trust instrument, articles or certificate of incorporation, articles or certificate of formation, articles or certificate of organization, charter, by-laws, or other organizational documents, of any HIP Party, as applicable.

10.      Representations and Warranties of the TPP Parties.  To induce the HIP Parties to enter into this Agreement, the TPP Parties hereby jointly and severally represent and warrant to the HIP Parties as follows:

(a)      Each of the TPP Parties has read and fully understands each of the provisions of this Agreement.

(b)      Each of the TPP Parties has relied on the advice and representation of legal counsel of its own choice with respect to the matters set forth in this Agreement.

(c)      Each of the TPP Parties has signed this Agreement voluntarily, without any duress or undue influence on the part, or on behalf, of any Party.

(d)      Each TPP Party that is a legal entity: (i) is duly organized, existing and in good standing under the laws of the state in which it was formed or organized; (ii) is in good standing under the laws of the State of California; and (iii) has taken all necessary corporate, limited liability company, trust, general partnership and/or limited partnership actions, as applicable, to duly approve and authorize such TPP Party

- 29 -

Settlement Agreement

to enter into and perform this Agreement and no further such approval is necessary. As a condition precedent to the obligations of the HIP Parties under this Agreement, upon execution hereof each TPP Party that is an entity shall provide HIP satisfactory evidence of the foregoing upon execution of this Agreement, in the form of certificates of status and good standing issued by the state of formation (if other than California) and the state of California, along with certified copies of secretary's certificates, incumbency certificate and certified resolutions of the governing body of the entity, as applicable, all in form and substance satisfactory to HIP.

(e)     CSD is the manager of TPP. Notwithstanding that DRD has signed various documents in connection with the Property (including without limitation the LJCI Settlement) as trustee of the Dickens Trust, the Dickens Trust was never formed or established and has never existed, and any and all obligations purporting to be obligations of the Dickens Trust to any of the HIP Parties are obligations of each of CSD and DRD jointly and severally.

(f)     Each TPP Party that is a natural person has full legal capacity to enter into and perform this Agreement. Each TPP Party that is a natural person executing this Agreement on behalf of a TPP Party that is an entity has full power, right and authority to execute this Agreement on behalf of such entity and so bind such entity.

(g)     Entering into and performing this Agreement will not violate any provision of law or the any limited partnership agreement, general partnership agreement, limited liability company agreement, operating agreement, trust instrument, articles or certificate of incorporation, articles or certificate of formation, articles or certificate of

- 30 -

LAI 2604321v.16

organization, charter, by-laws, or other organizational documents, of any TPP Party, as applicable.

(h)     Prior to the Bankruptcy Court Hearing, TPP shall pay all delinquent property taxes and assessments affecting Lots 1, 2, 3, 4, 5 and 6 of the Property ("Applicable Lots") and provide written evidence of such payments to HIP. TPP shall represent to the Bankruptcy Court at the Bankruptcy Court Hearing that TPP has so paid such delinquent property taxes.  TPP shall further cure all property tax delinquencies affecting the Property in sufficient time such that no portion of the Property shall be subject to a notice of impending sale or subject to a notice of auction and provide written evidence of such cure to HIP as and when requested by HIP.

(i)     Fee simple title to the Applicable Lots is vested in TPP.  TPP has previously conveyed to Tower Financial and Sherbourne certain other portions of the Property (the "Extra Parcels") identified on Exhibit H attached hereto.  Prior to the Bankruptcy Court Hearing, Tower Financial and Sherbourne shall execute and deliver to TPP and caused to be recorded in the official records of Los Angeles County grant deeds to the Extra Parcels in form and substance satisfactory to the Title Company, and obtain from the Title Company at TPP's cost such title endorsements as HIP may require to ensure that all of the Property is vested solely in TPP.

11.   Miscellaneous.

(a)     The Parties expressly consent to the jurisdiction of the Bankruptcy Court to enforce this Agreement, and any and all orders that may hereafter be entered by the Bankruptcy Court which are contemplated by this Agreement.

- 31 -

Settlement Agreement

LA1 260432 v.16

(b)      This Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original, but all of which, when taken together, shall constitute one agreement.

(c)      The headings and captions in this Agreement are for convenience of reference only, and shall not limit or otherwise affect the meaning of any provision of this Agreement.  All exhibits attached to this Agreement are incorporated herein by reference.

(d)      This Agreement contains all of the terms and conditions agreed upon by the Parties regarding the subject matter of this Agreement.  Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement not expressly set forth or referred to in this Agreement are of no force or effect.  Each of the Parties acknowledges that no one has made any promise, representation or warranty whatever, express or implied, not contained or referred to herein concerning the subject matter of this Agreement to induce such Party to execute this Agreement.  Each of the Parties acknowledges that it is not executing this Agreement in reliance upon any promise, representation, or warranty not contained or referred to in this Agreement.

(e)      This Agreement has been negotiated at arms' length between and among entities and persons sophisticated and knowledgeable in the matters dealt with in this Agreement.  In addition, this Agreement was reviewed by experienced and knowledgeable legal counsel for each of the Parties.  This Agreement shall be deemed to

- 32 -

Settlement Agreement

EXHIBIT J
199

have been drafted jointly by the Parties. It is agreed and understood that any rule that ambiguities are to be construed against the drafter shall not apply to this Agreement.

(f)    This Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of California and federal law under the Bankruptcy Code.

(g)    This Agreement shall bind and inure to the benefit of the Parties and each of the Parties' respective successors, assigns, heirs and personal representatives.

(h)    Any amendment or modification of this Agreement must be in writing, and signed by the Parties. Any amendment or modification not made in this manner shall have no force or effect.

(i)    Any notice to be given to one of the Parties shall be in writing and shall be given by personal delivery, overnight delivery, or by registered or certified mail with return receipt requested (with contemporaneous notice by facsimile) and addressed as follows:

To TPP:

Charles S. Dickens
1124 Marilyn Dr.
Beverly Hills, CA 90210

With a copy to:

David B. Golubchik, Esq.
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067

- 33 -

Settlement Agreement

To TPDS, CSD, DRD, LA Stars, VN, Advisors, VFN, Sherbourne, Tower Financial and SCP :

Charles S. Dickens                    and        Victor Franco Noval
1124 Marilyn Dr.                                 1124 Marilyn Dr.
Beverly Hills, CA 90210                          Beverly Hills, CA 90210

With a copy to:

David J. Wohlberg, Esq.
TroyGould
1801 Century Park East, Suite 1600
Los Angeles, CA 90067-2367


To the HIP Parties:


c/o Hughes Investment Partnership, LLC
2700 Neilson Way
Suite 635
Santa Monica, CA  90401
Attention:  Conrad L. Klein


With a copy to:

Robert P. Friedman, Esq.
Law Offices of Robert P. Friedman
827 Moraga Drive
Bel Air, CA 90049

With a copy to:

Paul Walker, Esq.
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013


     Any of the Parties may, by written notice to the other Parties, designate a different

person, address, telephone or facsimile number, or other information specified above,

which shall be substituted for the one specified above.  Any such notice shall be deemed

- 34 -

Settlement Agreement

LA1 2604321v.16

to have been delivered upon its receipt or upon the second attempt at delivery, as evidenced by the regular records of the person or entity attempting delivery.

(j)     Time is of the essence of each and every provision of this Agreement.  Without limiting the foregoing, no date or deadline for the payment of the Initial Extension Payment or any Quarterly Extension Fee or for payment of any Discounted Payoff Amount shall be subject to any grace or cure period.  All such dates shall be strictly observed.

(k)     Each of the Parties agrees to execute such additional documents and take such additional actions as may be reasonably requested by the other Parties in order to carry out the purpose and intent of this Agreement, or to evidence anything contained in this Agreement.

(l)     This Agreement shall be effective against the Parties only upon execution hereof by all of the Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

[SEE ATTACHED SIGNATURE PAGES]

- 35 -

Settlement Agreement

LA1 2604321v.16

EXHIBIT J
202