# EXHIBIT W

JS - 6

NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Tower Park Properties* | CASE NO. CV 13-1518-GHK |
| | MEMORANDUM DECISION |

Appellant Fiduciary Trust International of California ("FTIC") appeals the bankruptcy court's order approving a settlement agreement that makes various changes to Appellee Tower Park Property, LLC's ("TPP") confirmed Chapter 11 plan of reorganization. FTIC argues that the settlement modified the plan in violation of 11 U.S.C. § 1127. We conclude that FTIC does not have standing to prosecute this appeal.

## I.    BACKGROUND

### A.    *The Underlying Property and Its Sale*

When Mark Hughes, the founder of Herbalife, died in 2000, the bulk of his substantial estate was placed in the Hughes Family Trust (the "Trust"). *See Hughes v. Klein*, 2015 WL 1455981, at *1 (Cal. Ct. App. Mar. 30, 2015) (unpublished). Mark Hughes's only son, Alexander Hughes ("Hughes"), is the sole noncontingent beneficiary

1  of the Trust and cannot access the Trust principal until he turns 35 in 2026. *Id.* Before

2  he died, Mark Hughes named three successor trustees to the Trust: Conrad Lee Klein,

3  Christopher Pair, and Jack Reynolds (the "Trustees"). *Id.*

4

5      In 2004, Appellee Tower Park Properties, LLC ("TPP"), an entity owned by

6  Charles "Chip" Dickens ("Dickens"), purchased 157 acres of land in Beverly Hills (the

7  "Property") from the Trust. The sale, approved by the Trustees, was entirely seller-

8  financed. TPP received loans from two entities controlled by the Trust: MH Holdings II

9  H, LLC ("MH II") and Hughes Investment Partnership, LLC ("HIP") (collectively, the

10  "Hughes Entities"). Through these loans, the Hughes Entities became TPP's largest

11  secured creditors.[1]

12

13  ### B.    *Bankruptcy Court Proceedings*

14  #### 1.    **The Reorganization Plan**

15      When TPP's project to develop the Property ran into trouble, it filed for Chapter 11

16  bankruptcy. (Bk. Dkt. 190.) As of 2009, the Hughes Entities' total claims grew to

17  approximately $57 million, which included the purchase, construction, and development

18  financing plus interest. On April 1, 2010, the bankruptcy court confirmed TPP's Fifth

19  Amended Chapter 11 Plan of Reorganization (the "Plan"). (*Id.*) The Plan restructured

20  the Hughes Entities' loans, changed the interest rates and conditionally reduced the

21      [1] We grant FTIC's and TPP's requests to take judicial notice of various

22  documents filed in bankruptcy and state court proceedings. *See Harris v. Cty. of

23  Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of
undisputed matters of public record."). We also grant FTIC's request that we take

24  judicial notice of a report from the Office of Inspector General. *See United States

25  v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir.
2009) ("Judicial notice is appropriate for records and reports of administrative

26  bodies."); *Bloedow v. Planned Parenthood of the Great N.W. Inc.*, 2013 WL

27  6631771, at *4 (W.D. Wash. Dec. 16, 2013) (noting that reports of the Office of
Inspector General qualify as administrative reports).

28

1  balance on certain loans.  (*See* ER 33.)  The Plan also set a maturity date of April 16,

2  2014.  (*Id.*)  The Hughes Entities agreed to provide TPP with $7 million in exit financing

3  to begin development of the Property.  (*Id.*)  TPP expected to satisfy its obligations to its

4  various creditors through the "sale, refinancing or joint venture involving one or more" of

5  the Property's lots.  (ER 15.)

6

7          After confirmation of the Plan, TPP and various related entities (the "TPP Parties")

8  had a number of contentious legal disputes with the Hughes Entities and the Trustees (the

9  "HIP Parties") over the Plan's implementation.  (*See* Bk. Dkt. 558, Walker Decl. ¶¶ 3-5.)

10  In November 2012, the HIP Parties and the TPP Parties participated in a mediation to

11  resolve these disputes.  (*See id.* ¶ 10.)  Meanwhile, Hughes filed a petition in California

12  probate court to remove the Trustees for alleged breach of their fiduciary duties in large

13  part based on their sale of the Property to TPP (the "Removal Action").  (*See* Bk. Dkt.

14  399, Ex. 1.)  Around the time the mediation began, the Removal Action against the

15  Trustees proceeded to trial, ending in December 2012.  (*See* Bk. Dkt. 399, Ex. 5.)  The

16  state court took the matter under submission at that time.  (*Id.*)

17

18          **2.      The Settlement Agreement**

19          In January 2013, after a successful mediation, the TPP Parties and the HIP Parties

20  entered into a settlement agreement (the "Settlement").  (*See* ER 97.)  The Settlement

21  required the TPP Parties to, immediately upon execution of the Settlement, make a non-

22  refundable, lump-sum payment of $5 million to HIP and dismiss any and all claims

23  against the HIP Parties.  (ER 99-100.)  The HIP Parties agreed to various "Plan

24  Modifications" if the bankruptcy court approved the Settlement.

25

26          The Parties agreed that the HIP Parties' obligations under the Settlement,

27  collectively designated the "Conditional Provisions," would be "void and of no force or

28  effect ab initio" if "Bankruptcy Court Approval [was] not obtained by February 15,

1  2013" (the "BCA Condition").  (ER 106.)  All other provisions of the Settlement were

2  "effective and operative upon execution" and were to remain "binding, enforceable,

3  irreversible, and non-rescindable regardless of whether or not [] Bankruptcy Court

4  Approval [was] ever obtained." (*Id.*)  According to the Settlement, "Bankruptcy Court

5  Approval" would be considered "final upon the expiration of the fourteen (14) day appeal

6  period following entry of the bankruptcy court's order *without the filing of any appeal*."

7  (*Id.* (emphasis added).)   The HIP Parties expressly "agree[d] to cooperate with and

8  support the TPP Parties' efforts to seek Bankruptcy Court approval [sic] of the

9  Conditional Provisions" (the "Cooperation Clauses"). (*Id.*)

10

11      On January 4, 2013, TPP filed its motion for settlement approval with the

12  bankruptcy court under Rule 9019 of the Bankruptcy Code (the "9019 Motion"). (Bk.

13  Dkt. 386.)  On January 10, 2013, in response to the filing of the 9019 Motion, Hughes

14  filed an ex parte application (the "Ex Parte Application") in the Removal Action to have

15  the Trustees removed immediately, arguing among other things that the Trustees had lied

16  to the state court during the trial about the existence of ongoing settlement discussions

17  with the TPP Parties. (*See* ER 205-06.)  The state court granted the application in part,

18  appointing FTIC as trustee ad litem for the limited purpose of representing the Trust in

19  connection with the 9019 Motion (the "Appointment Order"). (ER 228.)  The court

20  ordered FTIC to "analyze . . . and independently determine whether the [Settlement] . . .

21  is proper and in the best interests of the Trust" and "take whatever action is necessary and

22  appropriate to promote or forestall approval of [the Settlement]."[2] (*Id.*)

23

24      On January 11, 2013, Hughes filed an objection to the 9019 Motion as an

25

26      [2] In March 2013, the state court granted Hughes's petition to remove the
27  Trustees, finding that they had breached their duty to act with prudence, skill, and
    diligence when they sold the Property.  FTIC was then appointed the successor
28  trustee of the Trust. *See Hughes*, 2015 WL 1455981, at *2.

4

"interested party" and notified the bankruptcy court of the state court's appointment of

FTIC as trustee ad litem. (*See* ER 154, 157.) He argued that the Settlement was not

negotiated in good faith and that it constituted an impermissible "modification" of a

"substantially consummated" plan, which is prohibited by § 1127(b) of the Bankruptcy

Code.[3] (ER 155, 157.) He requested that the bankruptcy court either deny approval of

the Settlement or wait to issue a ruling until FTIC had had sufficient time to review it.

(ER 170.)

On January 14, 2013, FTIC filed a limited joinder to Hughes's objection,

requesting "time to enable [it] to review and independently determine whether the

Agreement is proper and in the best interests of the Trust." (TPER 4.) It also joined the

objection to the extent Hughes raised any "procedural infirmities" with the Settlement's

approval. (*Id.*) TPP filed a reply opposing Hughes's objection and FTIC's limited

joinder, claiming that neither Hughes nor FTIC had standing to object to the Settlement

and that the Settlement did not constitute an impermissible Plan modification. (*See* Bk.

Dkt. 402.)

At the hearing on the 9019 Motion on January 23, 2013, the bankruptcy court

concluded that both Hughes and FTIC had standing to object to the Settlement, but

approved the Settlement nevertheless (the "9019 Order"). (*See* ER 233-34, 272.)

Although the Settlement was "troubl[ing]," the court concluded that it was "not an

improper modification" and benefited the estate. (ER 269.)

---

[3] Section 1127(b) provides, in relevant part: "The proponent of a plan or the
reorganized debtor may modify such plan at any time *after* confirmation of such
plan and *before* substantial consummation of such plan[.]" 11 U.S.C. § 1127(b)
(emphases added).

1    *C.    Appeal of the 9019 Order*

2    On February 5, 2013, Hughes appealed the 9019 Order.  (Bk. Dkt. 410.)  FTIC

3    filed the instant appeal shortly thereafter on February 15, 2013.  (Bk. Dkt. 416.)  After

4    concluding that Hughes lacked party-in-interest status in the bankruptcy court, we

5    dismissed his appeal for lack of bankruptcy standing.  The Ninth Circuit recently

6    affirmed our decision in *In re Tower Park Properties, LLC*, 803 F.3d 450, 452 (9th Cir.

7    2015).

8

9    On April 5, 2013, FTIC moved to dismiss this appeal for lack of judiciable

10   controversy.  (Dkt. 13.)  It argued that the Conditional Provisions were void because the

11   February 15, 2013 deadline for Bankruptcy Court Approval of the Settlement had passed

12   with appeals pending.  (*Id.* at 16.)  Because there were underlying factual disputes that

13   prevented us from determining whether the Conditional Provisions remained enforceable,

14   we remanded the issue to the bankruptcy court to determine whether the Conditional

15   Provisions were void.  (Dkt. 31.)  On remand, the bankruptcy court found and concluded,

16   *inter alia*: (1) neither Hughes's appeal nor FTIC's appeal voided the Conditional

17   Provisions, and (2) since FTIC represented that it was the successor-in-interest to the

18   Trustees at the 9019 Motion hearing, FTIC was judicially estopped from denying that it

19   was acting as the successor-in-interest; as such, FTIC breached the Settlement by taking

20   actions in opposition to Bankruptcy Court Approval, such as the filing of an appeal.  (*See*

21   Bk. Dkt. 620 at 5-7.)

22

23   FTIC appealed.  (CV 15-1989, Dkt. 1.)  On April 7, 2015, we deemed that appeal

24   to be a continuation of this appeal and construed it as a request to rule on FTIC's motion

25   to dismiss for lack of judiciable controversy.  (Dkt. 59.)  We affirmed the bankruptcy

26   court's conclusion that the Conditional Provisions are still enforceable and this appeal is

27   not moot, and we accordingly denied FTIC's motion.  (Dkt. 64.)  We ordered the Parties

28   to submit briefing on the merits of FTIC's appeal, which is currently before us.  (*Id.* at

1  20.)

2

3  **II.    ANALYSIS**

4      *A.    Legal Standard*

5          We review a bankruptcy court's conclusions of law *de novo* and its factual findings

6  for clear error.  *Salazar v. McDonald (In re Salazar)*, 430 F.3d 992, 994 (9th Cir. 2005).

7  In reviewing factual findings for clear error, a district court may not simply substitute its

8  judgment for that of the bankruptcy court.  *See Grimes v. City & Cty. of San Francisco*,

9  951 F.2d 236, 241 (9th Cir. 1991).  Rather, the bankruptcy court's ruling is clearly

10  erroneous only when the district court is left with a "definite and firm conviction that a

11  mistake has been committed."  *See Burdick v. Comm'r Internal Rev. Serv.*, 979 F.2d

12  1369, 1370 (9th Cir. 1992).

13

14      *B.    Issues*

15          FTIC argues that the bankruptcy court's order approving the Settlement should be

16  reversed for three reasons.  First, FTIC claims that the bankruptcy court erred by

17  approving plan "modifications" after substantial consummation of the Plan, which is

18  prohibited by 11 U.S.C. § 1127(b).  (FTIC Br. at 14.)  Second, FTIC argues that, even if

19  it were still possible to modify the Plan, TPP "did not establish, and the Bankruptcy

20  Court did not find, that [TPP] satisfied the postpetition disclosure and approval

21  requirements set forth in Sections 1125 and 1127(c) of the Bankruptcy Code."  (*Id.* at 20.)

22  Third, FTIC contends that the bankruptcy court failed to grant the comity owed to the

23  probate court by refusing to grant a continuance to allow FTIC to review the Settlement.

24  (*Id.* at 23.)

25

26      *C.    Threshold Considerations*

27          Before addressing the merits of FTIC's appeal, we must consider TPP's threshold

28  arguments.  Specifically, TPP argues that (1) the appeal is moot, (2) FTIC lacks appellate

1  standing to bring the appeal, (3) FTIC lacks prudential standing to bring its § 1127

2  arguments, and (4) FTIC failed to raise its § 1127 arguments in the bankruptcy court and

3  thus cannot bring them on appeal.  We address only TPP's appellate standing argument

4  because it is dispositive.  For the following reasons, we conclude that FTIC does not have

5  standing to bring this appeal, and therefore dismiss the appeal for lack of appellate

6  standing.

7

8          In addition to the requirements of Article III, "courts have created a[] . . .

9  prudential [appellate] standing requirement in bankruptcy cases:  The appellant must be a

10  'person aggrieved' by the bankruptcy court's order." *Duckor Spradling & Metzger v.*

11  *Baum Tr. (In re P.R.T.C., Inc.)*, 177 F.3d 774, 777 (9th Cir. 1999).  "An appellant is

12  aggrieved if directly and adversely affected pecuniarily by an order of the bankruptcy

13  court; in other words, the order must diminish the appellant's property, increase its

14  burdens, or detrimentally affect its rights." *Id.* (citation omitted); *see also In re Thorpe*

15  *Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012).  The doctrine of appellate standing

16  "exists to fill the need for an explicit limitation on standing to appeal in bankruptcy

17  proceedings.  This need springs from the nature of bankruptcy litigation which almost

18  always involves the interests of persons who are not formally parties to the litigation. . . .

19  Efficient judicial administration requires that appellate review be limited to those persons

20  whose interests are directly affected." *Fondiller v. Robertson (In re Fondiller)*, 707 F.2d

21  441, 443 (9th Cir. 1983).

22

23          FTIC argues that TPP should be judicially estopped from arguing that FTIC lacks

24  appellate standing and that, in any case, TPP's appellate standing arguments fail on the

25  merits.  We address each argument in turn.

26

27          **1.    Judicial Estoppel**

28  Judicial estoppel is "an equitable doctrine invoked by a court at its discretion."

1   *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted).

2   In general, three factors inform whether we apply judicial estoppel: "(1) Is the party's

3   later position 'clearly inconsistent with its earlier position?' (2) Did the party succeed in

4   persuading a court to accept its earlier position, creating a perception that the first or

5   second court was mislead? and (3) Will the party seeking to assert an inconsistent

6   position 'derive an unfair advantage or impose an unfair detriment on the opposing

7   party?'" *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012)

8   (quoting *New Hampshire*, 532 U.S. at 750-51)).

9

10        FTIC contends that TPP should be judicially estopped from arguing that FTIC

11   lacks appellate standing because TPP "persuaded the Ninth Circuit that FTIC was the

12   proper party in interest to pursue this appeal and was willing and able to do so." (FTIC

13   Reply at 4.)  FTIC points out that when TPP argued to the Ninth Circuit that Hughes did

14   not have bankruptcy standing, TPP contended that "FTIC—the only party with legal

15   standing to act on behalf of the Hughes Trust—is currently litigating precisely the same

16   issues that Alexander has raised with respect to the Settlement Agreement." (Dkt. 72,

17   Request for Judicial Notice ("RJN"), Ex. B, Appellee's Opening Br. at 32.)  FTIC

18   contends that this argument is clearly inconsistent with TPP's current assertion that FTIC

19   does not have appellate standing, that the Ninth Circuit relied on this argument, and that

20   allowing TPP to proceed with its current position would be unfair.  (*See* FTIC Reply at 5-

21   7.)

22

23        We decline to invoke the doctrine of judicial estoppel because the Ninth Circuit

24   never reached the question whether FTIC had appellate standing.  The only issue on

25   appeal was whether Hughes had bankruptcy court standing.  *See Tower Park*, 803 F.3d at

26   456 ("[T]he question presented is one of bankruptcy standing.").  Hughes did not have

27   bankruptcy standing because he lacked "party in interest" status.  In reaching this

28   conclusion, the Ninth Circuit noted that "FTIC is the present trustee for the Trust, a

1  willing and able advocate for the Trust's assets, and the proper party in interest in this

2  case." *Id.* at 461. But the court said nothing about FTIC's standing to *appeal* the

3  bankruptcy court's order. Appellate standing and bankruptcy standing are not

4  coterminous; they are two distinct types of standing. *See Thorpe*, 677 F.3d at 883-84

5  ("Two types of standing are at issue: (1) standing to object to the confirmation of the plan

6  in bankruptcy court ('bankruptcy standing') and (2) standing to appeal that confirmation

7  ruling ('appellate standing')."). A party may have bankruptcy standing, but lack

8  appellate standing. *See In re Refco Inc.*, 505 F.3d 109, 117, 120 (2d Cir. 2007)

9  (concluding that "[t]he party in interest is Sphinx," but that Sphinx nonetheless did not

10  have standing to appeal a bankruptcy court order); *Advantage Healthplan, Inc. v. Potter*,

11  391 B.R. 521, 541 (D.D.C. 2008) (noting that "merely being a party in interest is

12  insufficient to confer appellate standing"), *aff'd sub nom. Greater Se. Cmty. Hosp.*

13  *Found., Inc. v. Potter*, 586 F.3d 1 (D.C. Cir. 2009). Even if TPP had argued

14  inconsistently that FTIC had appellate standing, it is not clear that the Ninth Circuit

15  accepted or relied on that position because the court only addressed the issue of

16  bankruptcy standing. The second—and most critical—*New Hampshire* factor is not met,

17  and the doctrine of judicial estoppel does not apply. *See Interstate Fire & Cas. Co., an*

18  *Ill. Corp. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998) ("A

19  majority of courts apply judicial estoppel only if the court has relied on the party's

20  previously inconsistent statement, and we have recently adopted that rule.").

21

22        **2.    Whether FTIC Has Appellate Standing**

23        FTIC also claims that TPP's appellate standing argument fails on the merits. TPP

24  argues that FTIC was not "directly and adversely" affected by the 9019 Order because

25  FTIC is bound to support the Settlement given that the Trustees consented to the

26  Settlement. (*See* TPP Br. at 3, 9-10.) TPP cites cases that stand for the proposition that a

27  party to a settlement is bound to the settlement and cannot object to it or appeal an order

28  approving it. *See Refco*, 505 F.3d at 120 ("Clearly, as a party to the Settlement

Exhibit W
423

1  Agreement, Sphinx is precluded from appealing the bankruptcy court's order [approving

2  the Settlement]."); *New York ex rel. Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 69 (2d

3  Cir. 1996) ("Appeal from a consent judgment is generally unavailable on the ground that

4  the parties are deemed to have waived any objections to matters within the scope of the

5  judgment."); *Coughlin v. Regan*, 768 F.2d 468, 469-70 (1st Cir. 1985) ("It is uncontested

6  that a party to a consent judgment is thereby deemed to waive any objections it has to

7  matters within the scope of the judgment."); *see also Christian Sci. Reading Room Jointly*

8  *Maintained v. City & Cty. of San Francisco*, 784 F.2d 1010, 1017 (9th Cir. 1986) ("The

9  normal rule is that a party cannot appeal from an order which it consented to have entered

10  against it.").

11

12    FTIC makes no effort to address these cases.  Rather, it argues that, as trustee ad

13  litem, it "was not bound by the agreements of the conflicted Co-Trustees" and thus has

14  standing to pursue this appeal.  (FTIC Reply Br. at 10-11.)  It notes that, pursuant to the

15  Appointment Order, the state probate court appointed it as trustee ad litem "to determine

16  whether the Agreement was in the Trust's best interests and 'promote or forestall' [the

17  Agreement's] approval by the bankruptcy court."  (*Id.*)  Notably, the Appointment Order

18  says nothing about FTIC not being bound by the Settlement.  But FTIC also points to a

19  "Clarifying Order" issued by the probate court on August 21, 2015 that purportedly

20  clarifies the Appointment Order.  The Clarifying Order states, in relevant part, that (1) the

21  office of trustee ad litem "is a separate and distinct office from that of trustee of the Trust,

22  including the office of successor trustee"; and (2) in its capacity as trustee ad litem, FTIC

23  "is not bound to the actions taken, obligations incurred and/or agreements made by the

24  office of trustee, including particularly those actions taken, obligations incurred and

25  agreements made by former trustees Klein, Pair and Reynolds."  (Dkt. 66, Ex. A,

26  Clarifying Order at 5.)  FTIC argues that the Appointment Order and Clarifying Order

27  demonstrate that it was not bound by the Settlement.  (*See* FTIC Reply at 10-11.)  We

28  disagree.

11

1    In order to understand the effect of the Clarifying Order, we must read it in

2    conjunction with Hughes's Ex Parte Application to appoint FTIC as trustee ad litem and

3    the Appointment Order itself.  The Clarifying Order must also be read to comply with the

4    requirements of law.

5

6    Under California law, a court may appoint a trustee "ad litem" that is different

7    from a successor trustee in that the trustee ad litem would have only "limited powers to

8    conduct . . . litigation" on behalf of the trust and would not supplant the existing trustee

9    completely.  *Getty v. Getty*, 205 Cal. App. 3d 134, 141 (1998); *see also* Restatement

10   (Third) of Trusts § 107 (2012) (stating that a trustee ad litem may be appointed where

11   appropriate to "assure independent and disinterested decisions regarding the prosecution

12   of the proceedings in question").  But *Getty* does not suggest that a trustee ad litem is

13   untethered from the then-existing trustee's previous acts, or that those prior acts and

14   commitments are rendered meaningless merely by virtue of the trustee ad litem's

15   appointment.  Rather, there are specific avenues through which a trustee ad litem can

16   challenge, and seek to set aside, a full trustee's actions under California law.  Pursuant to

17   the California Probate Code, if a trustee has committed "a breach of trust," a "beneficiary

18   or cotrustee of the trust" can "commence a proceeding . . . to set aside the acts of the

19   trustee" provided that any "third party dealing with [the] trustee" has acted in bad faith

20   and with actual knowledge of the breach.  *See* Cal. Prob. Code §§ 16420(a)(6), 18100; *cf.*

21   Bogert's on Trusts § 861 ("Transactions which are in breach of the duty of loyalty are

22   frequently set aside.").  In a similar vein, in *City of Atascadero v. Merrill Lynch, Pierce,*

23   *Fenner & Smith, Inc.*, the California Court of Appeal authorized a trust beneficiary to

24   proceed against third parties who allegedly "actively participated with a trustee in a

25   breach of trust for their own financial advantage."  68 Cal. App. 4th 445, 467 (1998).[4]

26   _____

27   [4] As the Ninth Circuit noted in *Tower Park*, *Atascadero* also held that, where
     a successor trustee is willing and able to take action against such third parties, a
28   trust beneficiary may not maintain a suit to accomplish the same end.  *Tower Park*,

Exhibit W
425

1    Neither the Probate Code nor *Atascadero* suggests that a trustee ad litem or successor

2    trustee can escape the consequences of a trustee's actions solely by virtue of appointment.

3    Rather, to undo the trustee's actions, a duly appointed trustee ad litem or successor

4    trustee must take some legal action and prove wrongdoing by the trustee and any third

5    parties dealing with the trustee.  To our knowledge, FTIC has not proceeded with any

6    such action with regard to the Settlement.

7

8         Nothing in Hughes's Ex Parte Application or the Appointment Order conflicts with

9    our understanding of the role of a trustee ad litem under California law.  When Hughes

10   requested that the state court appoint a trustee ad litem, he described the intended purpose

11   of the trustee ad litem as follows: "[A] new, independent, interim Trustee, acting only

12   with the Trust's (and not the Trustees') best interests in mind, can evaluate the settlement

13   and determine how the Trust actually should proceed, including, but not limited to,

14   whether the best interests of the Trust militate in favor of withdrawing and/or objecting to

15   the settlement in Bankruptcy Court, or seeking to set aside the self-interested settlement.

16   (*See* Cal. Prob. Code § 16420(a), (a)(6); . . . *City of Atascadero v. Merrill Lynch, Pierce,*

17   *Fenner & Smith, Inc.* (1998)[]68 Cal. App. 4th 445, 464 . . . .)."  (Ex Parte Application,

18   ER 220-21.)  Hughes asked the probate court to appoint a trustee ad litem who would be

19   able to make disinterested decisions on behalf of the Trust for a limited purpose, which is

20   precisely the function of a trustee ad litem as described in *Getty*.  Moreover, he

21   specifically cited the California Probate Code and *Atascadero*, which require a showing

22   of collusion to set aside a trustee's actions and proceed against a third party.  Thus, the

23   Ex Parte Application contemplated the appointment of a trustee ad litem who would

24   independently review the Settlement and then decide whether to challenge the Settlement

25   within the bounds of California trust law.  It did not contemplate that, upon appointment,

26   _____

27   803 F.3d at 462 (citing *Atascadero*, 68 Cal. App. 4th at 467-68).  Thus, FTIC,
     rather than Hughes, would likely be the proper party to bring an *Atascadero* claim.

28   *See id.*

1   FTIC would not be bound by the Settlement without taking further action against the

2   Trustees and/or the TPP Parties.

3

4        The Appointment Order also suggests that FTIC could not avoid being bound by

5   the Settlement by virtue of its appointment alone.  The Order stated that "the Trustee ad

6   litem shall analyze the settlement at issue in the Motion and independently determine

7   whether the settlement at issue in the Motion is proper and in the best interests of the

8   Trust, and shall take whatever action is necessary and appropriate to promote or forestall

9   approval of the settlement agreement in the Bankruptcy Proceeding."  (ER 228.)  This

10  language is entirely consistent with the request in Hughes's Ex Parte Application and

11  with the role of a trustee ad litem under California law.  FTIC could "take whatever

12  action is necessary and appropriate to promote or forestall approval of the settlement

13  agreement," which could have included filing an *Atascadero* claim or an action under the

14  Probate Code to set aside the Settlement.  This does not mean, however, that FTIC could

15  avoid being bound by the Settlement without any showing of collusion between the

16  Trustees and the TPP Parties.

17

18       California trust law, the Ex Parte Application, and the Appointment Order provide

19  us with a context in which to interpret the Clarifying Order.  As mentioned, the

20  Clarifying Order purports to clarify the Appointment Order.  (*See* Clarifying Order at 1.)

21  It states that, in FTIC's capacity as trustee ad litem, FTIC "is not bound to the actions

22  taken, obligations incurred and/or agreements made by the office of trustee[.]"  (*Id.*)

23  Harmonizing the various sources discussed above, we read the Clarifying Order to mean

24  that, in the proper context, FTIC is not bound by the Settlement.  Indeed, all of these

25  sources stand for the proposition that, as trustee ad litem, FTIC can challenge the

26  Settlement but must do so within the confines of the law.  Had FTIC successfully brought

27  a claim to set aside the Settlement under the Probate Code, for example, then it would not

28  be bound to the actions taken, obligations incurred, and/or agreements made by the

1    Trustees with respect to the Settlement.  The Ex Parte Application specifically

2    contemplated litigation along these lines.  But, as mentioned, FTIC has not proceeded

3    with any such lawsuit to our knowledge.  Failing this, FTIC has not shown that it is not

4    bound by the Settlement.

5

6        Our interpretation of the Clarifying Order is not only consistent with the law, but

7    also avoids a reading that would make for unsound policy.  As discussed, in order to set

8    aside the Settlement under the Probate Code or to proceed against the TPP Parties under

9    *Atascadero*, FTIC must show that the Settlement was a product of collusion.  Allowing

10    FTIC to claim that it is not bound by the Settlement by virtue of its appointment as

11    trustee ad litem would relieve it of any such showing.  In essence, we would allow FTIC

12    to nullify any obligations it had under the Settlement at its pleasure.  Permitting this end

13    run around state law would discourage third parties from entering into contracts with

14    trustees out of fear that a trustee ad litem may one day rescind or challenge the contracts

15    with no showing of wrongdoing on the part of the other contracting party whatsoever.

16    Neither the law nor wise policy permits such a result.

17

18        In sum, when FTIC was appointed trustee ad litem, it was bound by the Settlement

19    pursuant to general principles of California trust law.  FTIC did not take any actions

20    under California law—such as proceeding with a claim under California Probate Code

21    § 16420(a)(6) or *Atascadero*—that may have released it from its obligations under the

22    Settlement.  As such, FTIC has failed to provide us with any reason to conclude that it is

23    not bound by the Settlement.  Because a party to a settlement does not have standing to

24    appeal an order approving the settlement, we conclude that FTIC does not have appellate

25    standing.  *See Refco*, 505 F.3d at 120 (holding that liquidators who "st[oo]d in the shoes"

26    of an investment company could not appeal a bankruptcy court order approving a

27    settlement because the company had "consented to the Settlement" and thus was "bound

28    by it on appeal").  Accordingly, FTIC is precluded from appealing the bankruptcy court's

15

order.  Because FTIC does not have standing to prosecute this appeal, we need not reach the merits of its claims that the bankruptcy court erred in approving the Settlement.

## III.    CONCLUSION

For the foregoing reasons, we hereby **DISMISS** FTIC's appeal for lack of appellate standing.

**IT IS SO ORDERED.**
DATED: July 1, 2016

_____

GEORGE H. KING
United States District Judge

16